# IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH CENTRAL DIVISION

| | |
|---|---|
| PAUL RICHARD PAYNE,<br><br>    Plaintiff,<br><br>  v.<br><br>CLINT FRIEL et al.,<br><br>    Defendants. | **MEMORANDUM DECISION AND ORDER**<br><br><br>Case No. 2:04-CV-844-DN<br><br>District Judge David Nuffer |

Plaintiff, Paul Richard Payne, an inmate at the Utah State Prison, filed this *pro se* civil rights suit under 42 U.S.C. § 1983.  *See* 42 U.S.C.S. § 1983 (2012).  Plaintiff was allowed to proceed *in forma pauperis*.  *See* 28 *id*. 1915 (2012).  The court is considering Defendants' Motion for Summary Judgment.

## I.  Introduction

Plaintiff's seventeen-count original Complaint (Doc. No. 4) alleged numerous constitutional violations including cruel and unusual punishment under the Eighth Amendment based on his housing conditions in administrative segregation (ad-seg).  After the entire Complaint was dismissed in April 2007 (Doc. No. 41) Plaintiff appealed to the Tenth Circuit which remanded only his due-process claim for further proceedings (Doc. No. 57).  Plaintiff's sole remaining claim is that he was denied due process regarding his placement in ad-seg.  Specifically, Plaintiff alleges that he was arbitrarily placed in ad-seg upon his return to the prison in 2003 and that he has been kept there without due process ever since.  Plaintiff states that under

ad-seg he is locked in his cell all but three hours per week and is denied access to books,

magazines, a television or radio, paper, art supplies, hobby/craft materials, and all other means of

entertainment.  Plaintiff also asserts that he has no access to jobs, programming or education,

which eliminates any possibility of rehabilitation.  (*See* Tenth Circuit Mandate (Doc. No. 57,

entered Feb. 20, 2008), at 7.)

Defendants' summary-judgment motion asserts that Plaintiff was afforded due process

regarding his initial placement in ad-seg and that he has continued to receive meaningful reviews

of his placement on a regular basis.  Defendants further deny that Plaintiff's conditions of

confinement are sufficiently harsh to implicate federal due-process requirements.  Instead,

Defendants contend that Plaintiff's housing conditions do not amount to the type of "atypical and

significant hardship" which the Supreme Court has found necessary to invoke constitutional due-

process protections.  *See Sandin v. Conner*, 514 U.S. 472, 484, 115 S. Ct. 2293, 2300 (1985).

After reviewing the parties' summary-judgment materials the court determined that the

most efficient way to resolve Plaintiff's claim would be to first decide whether the process

afforded Plaintiff in relation to his ad-seg placement satisfies constitutional standards.[1]  Only if

---

[1] The court determined that this approach would be most efficient given Plaintiff's *pro se* status and related security concerns, the unsettled law in this area, and other practical constraints. This approach greatly simplified discovery because the due-process question involves a largely written record, requires fewer facts which are less subject to dispute, and does not require expert testimony.  It also ameliorates security concerns by avoiding comparisons with other prisoners' conditions and histories, which the Tenth Circuit has found necessary to establish the appropriate baseline for evaluating "atypicality."  *See Rezaq v. Nalley*, Nos. 11–1069, 11–1072, 2012 WL 1372151, at *9 (10th Cir. Apr. 20, 2012) ("In cases involving placement in nondisciplinary administrative segregation, it is appropriate to compare the conditions at issue with those ordinarily experienced by inmates with similar records and sentences.").  Allowing Plaintiff (who

the court determined that the process afforded Plaintiff was inadequate would it then need to delve into the more complicated question of whether Plaintiff's conditions amount to an "atypical and significant hardship" under evolving caselaw.[2]

In accordance with this approach, the parties were instructed to file supplemental summary-judgment briefs addressing only the legal standard and facts relevant to the due-process inquiry.  (Doc. nos. 264 & 269.)  The court carefully reviewed these submissions and issued Proposed Findings of Fact Regarding Due Process.   (Doc. No. 295.)  It then sought additional input from the parties before arriving at undisputed material facts.  (Doc. No. 308, Minute Entry for hearing held Feb. 29, 2012.)  After finding the sparse documentation in the record to be insufficient regarding the review process afforded Plaintiff from 2007 to the present the court conducted a lengthy hearing to gather additional facts on that issue.  (Doc. No. 367, Transcript of hearing held October 5, 2012.)  Because those facts were possessed and controlled by

_____

proceeds *pro se* due to his demonstrated inability to work with appointed pro bono counsel on this case) to conduct the discovery necessary to establish such a comparative baseline would raise serious security concerns given Plaintiff's institutional history.  Finally, given the unsettled law regarding "atypicality" and the appropriate comparative baseline, the due-process inquiry is better suited to Plaintiff's limited legal expertise and ability to conduct legal research.

This approach was also implicitly approved by the Supreme Court in *Sandin v. Conner*, 515 U.S. 472, 115 S. Ct. 2293 (1995), which noted when discussing its decision in *Hewitt v. Helms*, 459 U.S. 460, 468, 103 S. Ct. 864 (1983), that *Hewitt's* "answer to the anterior question of whether the inmate possessed a liberty interest at all was unnecessary to the disposition of the case" because "it concluded that due process required no additional procedural guarantees for the inmate."  *Sandin*, 515 U.S. at 484, n. 5.

[2]  Under this approach, Defendants conceded, for purposes of this motion only, that Plaintiff's conditions of confinement amount to an "atypical and significant hardship" as required to invoke due-process protections under relevant caselaw.

Defendants, the hearing was intended to facilitate discovery by Plaintiff on the review process from 2007 to the present.  Those facts have been construed in the light most favorable to Plaintiff.  Based on this extensive record the court can now decide whether Defendants are entitled to summary judgment on the ground that Plaintiff was afforded due process.

## II.  Summary Judgment Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses," *Cellotex v. Catrett*, 477 U.S. 317, 324, 106 S. Ct. 2548, 2553 (1986), thus; "[a] party may move for summary judgment, identifying each claim or defense--or the part of each claim or defense--on which summary judgment is sought."  Fed. R. Civ. P. 56(a).

The party moving for summary judgment bears the initial burden of showing "that there is an absence of evidence to support the non-moving party's case."  *Cellotex*, 477 U.S. at 325.  This burden may be met merely by identifying portions of the record which show an absence of evidence to support an essential element of the opposing party's case.  *Johnson v. City of Bountiful*, 996 F. Supp 1100, 1102 (D. Utah 1998).  Once the moving party satisfies its initial burden "the burden then shifts to the nonmoving party to make a showing sufficient to establish that there is a genuine issue of material fact regarding the existence of [the disputed] element." *Id.*  A fact in dispute is "material" only if it might affect the outcome of the suit under governing law.  *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).  The dispute is "genuine" if the

evidence is such that it might lead a reasonable jury to return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

A nonmovant "that would bear the burden of persuasion at trial" must "go beyond the pleadings and 'set forth specific facts' that would be admissible in evidence in the event of a trial from which a rational trier of fact could find for the nonmovant." *Adler v. Wal-Mart Stores*, 144 F.3d 664, 671 (10th Cir. 1998). Mere allegations and references to the pleadings will not suffice; instead, the specific facts put forth by the nonmovant "must be identified by reference to an affidavit, a deposition transcript or a specific exhibit incorporated therein." *Thomas v. Wichita Coca-Cola Bottling*, 968 F.2d 1022, 1024 (10th Cir. 1992). Moreover, "the nonmovant's affidavits must be based upon personal knowledge and set forth facts that would be admissible in evidence; conclusory and self-serving affidavits are not sufficient." *Hall v. Bellmon*, 935 F.2d 1106, 1111 (10th Cir .1991). The court must "examine the factual record and reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Lopez v. LeMaster*, 172 F.3d 756, 759 (10th Cir. 1999). Conclusory allegations are given no weight, and "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient" to overcome a summary judgment motion. *Anderson*, 477 U.S. at 249, 252.

### III.  Material Facts Regarding Due Process[3]

### A.  Payne's Criminal History

1.      Paul Richard Payne is an inmate currently housed at the Utah State Prison.  Payne

---

[3] The material facts presented here are taken in the light most favorable to Plaintiff, the non-moving party.  Except as noted herein these facts are not disputed.

has an extensive criminal history which began when he was a juvenile.  (Pre-sentence

Investigation Report (*Martinez* Report [Doc. No. 118], Ex. *B*), at Misc. Records 000001-22.)  In

1990, when Payne escaped from a Juvenile Detention Center in Colorado Springs, Colorado, his

juvenile record had 113 entries.  Utah law enforcement officers arrested Payne after his escape

and placed him at the Carbon County Juvenile Detention Center for possession of a stolen car.

(*Id*.)

      2.      Payne subsequently escaped from the Carbon County Detention Center.  During

this second escape, Payne and two other juvenile offenders severely beat two detention officers.

Payne then stole a car with a five-year-old child in the back seat and led police on a high speed

chase.  (*Id.*)

      3.      As a result of this second escape, Payne pled guilty to Aggravated Robbery, four

counts of Aggravated Assault, Kidnapping, Theft, Failure to Respond to an Officer's Signal to

Stop, and Escape--all felonies.  Payne was sentenced to a term of 5 years to life at the Utah State

Prison.  (Judgment and Commitment (*Martinez* Report, Ex. B), at Misc. R. 000023-24.)

      4.      During Payne's Utah incarceration from January 9, 1991, until August 1996,

Payne's record included at least seventy-five reports of disciplinary violations, including weapon

possession, fighting/threats, assault, criminal acts, tampering with security devices, riot, extortion

and defiant behavior.  (Offender Discipline History (*Martinez* Report, Ex. B), at Misc. R.

000059-61.)

      5.      On July 6, 1994, while in punitive isolation for fighting, Payne assisted another

inmate, Troy Kell, in the calculated murder of fellow inmate Lonnie Blackmon.  (Investigative

Reports (*Martinez* Report, Ex. C), at Protected 000001-15.)

6.      On March 22, 1996, Payne pled guilty to Riot, a Third-Degree Felony, and

Criminal Mischief, a Third-Degree Felony, in relation to his participation in the Blackmon

murder.  (Judgment and Order (*Martinez* Report, Ex. B), at Misc. R. 000025-28.)  In exchange

for his plea, all other charges against Payne stemming from the Blackmon murder were

dismissed with prejudice.

7.      Pursuant to court order and the terms of the Interstate Compact, on September 3,

1996, Payne was transferred to a prison in New Mexico.  (Offender Location History (*Martinez*

Report, Ex. B), at Misc. R. 000064.)

8.      While held in New Mexico, Payne again escaped from custody, and was later

convicted for the third time of Escape, a Second-Degree Felony.  (Judgment, Order and

Commitment (*Martinez* Report, Ex. B), at Misc. R. 000029-30.)  A Supplemental Criminal

Information was also filed, alleging Payne was a habitual criminal offender.  Payne's Escape

sentence was enhanced pursuant to New Mexico's habitual offender statute.  (*Id*.)

9.      On June 17, 1999, while housed in administrate segregation in New Mexico,

Payne participated in another calculated murder of a fellow inmate.  (Judgment and Sentence

(*Martinez* Report, Ex. B), at Misc. R. 000031-32.)  Payne and a co-defendant, acting in concert,

and while both were housed in ad-seg, stabbed inmate Richard Garcia approximately 38 times

with homemade metal shanks.  (Investigative Reports (*Martinez* Report, Ex. B), at Misc. R.

000033-40.)

10.      Payne was convicted of First-Degree Murder, a capital felony, and was sentenced

to life in prison.  (Judgment and Sentence (*Martinez* Report, Ex. B), at Misc. R. 000031-32.)  He

was also convicted of Possession of a Deadly Weapon or Explosive by a Prisoner, a Second-

Degree Felony, and Conspiracy to Commit First-Degree Murder, and was sentenced to two nine-

year sentences, one to run concurrently with the First-Degree Murder sentence, and one to run

consecutively.  (*Id.*)

11.    Citing the Garcia murder and Payne's continuing threat to the security of its

prison system, New Mexico returned Payne to USP on December 10, 2003.  (New Mexico Mem.

(*Martinez* Report, Ex. B), at Misc. R. 000041.)

12.    Utah Department of Corrections (UDC) officials tried to obtain another Interstate

Compact placement for Payne but, due to his extensive violent history, all requests were denied.

(Interstate Compact Docs. (*Martinez* Report, Ex. B), at Misc. R. 000042-45.)

**B. Payne's Return to Utah State Prison**

13.    Upon his return to USP in December of 2003, Payne was initially placed in ad-seg

under the most restrictive classification level, Level One, and was assigned housing in the most

restrictive area of the prison, Uinta One.  (Nielsen Decl. (Doc. No. 117-4) ¶ 21.)

14.    On December 23, 2003, Payne attended his first Offender Management Review

(OMR) hearing since returning to USP.  Also attending were Captain Herman, Lieutenant

Meyers, Sergeant Knorr and Caseworker Summers.  The OMR team decided to leave Payne in

Uinta One for "30 day review pend[ing] additional observation/information."  (C-Notes/OMRs

(Defs.' Mem. in Resp. to Pl.'s Due Process Argument [Doc. No. 269], Ex. 2), at 11.)

15.    OMR hearings are intended to improve prison security and order by enabling

8

candid communication, enhancing management decisions, helping offenders with programming

and treatment, and promoting offender accountability.  (UDC Policy No. FEr06/02.02 [Doc. No.

289].)  During OMR hearings inmates are allowed to voice their concerns and discuss any issues

they have, including housing and classification concerns.  Inmates are also given behavioral goals

to work towards.  OMR hearings are attended by the inmate and UDC staff, including the

inmate's caseworker and housing supervisor.  (C-Notes/OMRs; Benzon Decl. [Doc. No. 200].)

An inmate can request to have the deputy warden, warden or other prison officials attend an

OMR if necessary to address specific concerns.  (Hearing Transcript p. 71-72.)

      16.     USP has a written Inmate Classification policy which details how inmates are

assessed and classified for security and housing purposes.  (UDC Policy No. FC04, revised April

23, 2012.)  The policy is intended to help prison officials manage inmates, enhance safety, enable

institutional security, and to determine housing assignments and eligibility for work and

programming opportunities.  (UDC Policy No. FC04/02.01.)  Under the policy each inmate

regularly undergoes an Offender Assessment/Reassessment which begins with the inmate's

caseworker completing a scoring matrix to determine the inmate's three-digit "Adjusted

Classification Code," which consists of his security score, custody score and behavior score.

(UDC Policy No. FC04/02.06.)  After reviewing this scoring with the inmate and noting any

comments, the caseworker forwards the form to the Unit Manager for review.  (UDC Policy No.

FC04/04.03D.)  If the Unit Manager disagrees in any way with the caseworker's determination he

must explain his concerns in the comments section of the form; if not, the Unit Manager

approves the assessment by signing and forwarding it to the Correctional Administrator (CA)

with a housing recommendation.  (UDC Policy No. FC04/04.03H-I.)   The CA then reviews the

form and determines the inmate's "CA Approved Classification Code" which establishes the

inmate's minimum institutional security level.  The form is then sent to the Classification Review

Officer (CRO) who distributes and files copies, records the data in various computer systems,

and ensures that a copy is provided to the inmate.  (UDC Policy No. FC04/04.03L.)  However,

the inmate is never given a copy of the comments section of the form after it is completed by the

various reviewing officers.  (Hearing Transcript p. 98-99.)

       17.     A "classification override" procedure allows prison officials to assign an inmate

"a different classification level than that which appears indicated by the classification score, due

to discretionary or non-discretionary security concerns or other legitimate penological interests."

(UDC Policy No. FC04/01.03.)  The five types of overrides include: (1) Severe Management, (2)

Notoriety, (3) Executive Director, (4) Safety, and (5) Medical/Psychological.  Prison policies

describe the conditions under which each type of override may be invoked, although there are

some areas of overlap between them.  (UDC Policy No. FC04/05.03-05.07.)  All overrides

require written justification and documentation.  (UDC Policy No. FC04/05.02.)  The only

written policy regarding the Executive Director Override (EDO) states: "Only the Executive

Director of the Utah Department of Corrections shall invoke/remove this override.  It can be

invoked at his administrative discretion to maintain, reduce or increase an inmate's classification

level."  (UDC Policy No. FC04/05.07.)  The policy does not provide any guidance concerning

how or when EDOs are reviewed.

       18.     Inmates may challenge their classification or override determinations using the

"classification challenge" process prescribed by policy.  (UDC Policy No. FC04/07.00-07.05.)

Inmates are expressly prohibited from challenging their classification or override determinations

through the Inmate Grievance process.  (UDC Policy No. FC04/07.01A.)  To initiate a

classification challenge the inmate must submit a classification challenge form to the CRO

within ten days after receiving the classification form.  (UDC Policy No. FC04/07.00-07.03A.)

The challenge must be based on one of three grounds: "(1) the decision was based on insufficient

or incorrect information; (2) proper procedures were not followed; or, (3) safety concerns."

(UDC Policy No. FC04/07.00-07.03B.)  A staff member may also initiate an classification

challenge if there is "reason to believe that an inmate has been mis-classified."  (UDC Policy No.

FC04/07.00-07.05.)  The CRO's decision to deny a classification challenge is final.  (UDC Policy

No. FC04/07.00-07.02D.)  However, if the CRO determines there may be merit to a challenge

she may refer the matter to the Unit Manager.  (UDC Policy No. FC04/07.00-07.05.)

     19.     On December 23, 2003, Payne underwent his first Offender Assessment following

his return to USP.  Caseworker Eileen Clark completed the assessment form which noted Payne's

"Current Classification Code" as A1K and resulted in an Adjusted Classification Code of B2K.

Payne received a copy of the form but refused to sign it.  The only entry in the Comments section

of the form is by Eileen Clark who noted, "Only death row inmates are Level 1."  The form was

also reviewed and signed without comment by the Unit Manager and a Correctional

Administrator.  No change was made to Payne's housing as a result of this reassessment.

(Reassessment Form dated December 23, 2003 (*Martinez* Report, Ex. C at 2-3.)

     20.     Payne received another OMR hearing on January 14, 2004.  This hearing was

attended by Payne, Officer Nielsen, Officer Herman and Caseworker Summers.   The OMR

committee decided that Payne's long-term housing assignment would be the low side of Uinta

One where he could be kept apart from Troy Kell.  (C-Notes/OMRs, at 11.)

21.     At his next OMR hearing on January 21, 2004, Payne received a Privilege Matrix

Level ("PML") of AB1 under the Privilege Behavior Reward System (FDr20 *Not In Record*) and

was approved to receive future privilege advancements through the OMR process.  (C-

Notes/OMRs, at 11.)

22.     Payne continued to receive OMR hearings approximately monthly throughout

2004, during which his PML was adjusted based on his behavior.  Following an OMR hearing on

Feburary 2, 2005, Payne was advanced to PML AE2.  (C-Notes/OMRs, at 11.)

23.     On January 20, 2005, Payne received his annual Offender Reassessment and

initially scored an Adjusted Classification Code of B2K.  Although there are no records

remaining from this challenge, Payne apparently challenged the computation of his security score

and it was adjusted by Margaret Brimhall to C2K.  The changes are initialed "MB."  The

comments, which were made before Brimhall's corrections, noted that Payne remained in

Intensive Management and recommended that he remain at classification B2K.  Payne received a

copy of this form which bears his signature.  (Reassessment Form dated Jan. 10, 2005 (*Martinez*

*Report*, Ex. B), at Misc. R. 000048-49.)

24.     On July 8, 2005, Payne received another Offender Reassessment which noted

Payne's Current Classification Code as C2K and also resulted in an Adjusted Classification Code

of C2K.  Absent an override, this score would have qualified Payne to advance to less restrictive

housing.  However, under the "Override Reasons" section of the form, "#3 Executive Director

Override" is selected and initialed "SVC," which retired Deputy Warden Blake Nielsen has

identified as the initials of former Executive Director Scott V. Carver.  (Nielson Decl. (Doc. No.

117-4) ¶ 23.)  The caseworker comments state: "Inmate was involved in killing 2 inmates in

separate prisons.  A #3 override is being invoked to keep him in Level 2 housing."  The Unit

Manager (or housing lieutenant), Lt. Clay Cawley, commented:

> I agree with the implementation and maintenance of the number three
> override.  I also recommend that [Payne] remain housed in Uinta One.
> Paul Payne has participated in the killing of two inmates while
> incarcerated.  Serious consideration should always be used when
> determining all classification and housing issues concerning this
> offender.

The form was also initialed without comment by the Correctional Administrator (or "housing

captain").  Payne's refusal to sign the form is also noted thereon.  (Reassessment Form dated July

8, 2005 (*Martinez* Report, Ex. B), at Misc. R. 000048-49; Nielson Decl. (Doc. No. 117-4) ¶ 23. )

    25.    The July 8, 2005, Offender Reassessment form was subsequently forwarded to

USP Deputy Warden Blake Nielsen for review.  He agreed that the Executive Director should be

petitioned to invoke an override to maintain Payne as a Level-Two classified inmate in Uinta

One housing.  Nielsen did not make any written comments on the assessment form and there is

no evidence of any additional written documentation being prepared for the Executive Director's

review.  Nielsen forwarded the original assessment form to Executive Director Carver.  (Nielsen

Decl. (Doc. No. 117-4) ¶ 23; Reassessment Form dated 7/8/2005 (*Martinez* Report, Ex. B).)

    26.    Former Executive Director, Scott V. Carver, approved the July 8, 2005, override

by circling and initialing the form where it says "Executive Director Override."  Besides Carver's

initials on the form, there is no other documentation indicating his approval of the initial

override.  (Nielson Decl. (Doc. No. 117-4); Reassessment Form dated July 8, 2005 (*Martinez*

Report, Ex. B) at Misc. R. 000050-51.)  Once implemented, the EDO prohibited Payne from

being reassigned to a less secure area of the prison without the Executive Director's written

approval.  (UDC Policy No. FC 04/05.07 (*Martinez* Report, Ex. A), at UDC Policy 000046;

Nielsen Decl. (Doc. No. 117-4).)

27.     On July 23, 2005, Plaintiff sent a letter to Executive Director Carver asking that

the EDO be rescinded and explaining the reasons why Plaintiff believed the EDO to be

unwarranted.  Plaintiff re-sent the letter on August 25, 2005, and again on October 22, 2005.

(Doc. No. 251, Ex. H p. 51.)  There is no evidence that Carver ever responded or took any other

action regarding this letter.

28.     During 2005 Plaintiff also filed multiple grievances regarding his classification

and the implementation of the EDO.  (Doc. No. 251, Ex. H p. 56 (Grievance No. 990858757,

filed July 14, 2005), p. 42 (Grievance No. 990859149, filed September 6, 2005), p. 41

(Grievance No. 990859566, filed October 15, 2005).)  On July 25, 2005, Plaintiff received a

grievance response from Tom Anderson, Management Services Administrator, denying

Plaintiff's first grievance and stating,

> You have clearly demonstrated over the years that [you] do not play
> nice with others, therefore, you are where you are.  Your housing
> placement is not likely to change in the foreseeable future because of
> your past behavior.  Any manager or administrator would be derelict
> in their duty if they were to recommend or approve your placement

14

in general population.  It's not going to happen.

(Doc. No. 251, Ex. H p. 48.)

29.     On August 1, 2005, Plaintiff received a response to his grievance about alleged

scoring errors on his Offender Reassessment Form, stating that the issue was moot and

explaining, "With the #3 override these points are meaningless because you cannot advance to a

level three until the Executive Director lifts the #3 override."  (Doc. No. 251, Ex. H p. 57.)

30.     On August 23, 2005, Plaintiff received a grievance response from Warden Clint

Friel and Billie Casper, Grievance Coordinator, rejecting Plaintiff's due-process argument on the

ground that "[d]ue process does not attach to administrative decisions" and stating that "written

notice is unnecessary because the OMR committee explains their decision (reason) to you in

person.  [And], [t]he decision is also documented in your C-note record."  (Doc. No. 251, Ex. H

p. 50.)

31.     On September 13, 2005, Plaintiff received another grievance response from Tom

Anderson stating, "You have an Executive Director Override and it is going to be a very long

time before you are ever intentionally allowed unimpeded contact with another human being.

You have earned this and it is appropriate."  (Doc. No. 251, Ex. H p. 44.)

32.     On October 3, 2005, Plaintiff received a letter from Tom Anderson denying "any

and all classification challenges" Plaintiff had filed up to that date and suspending Plaintiff from

the Classification Challenge system.  Anderson explained,

> Because the Executive Director has placed a classification override
> on you, your classification score is irrelevant.   Since your
> classification score is irrelevant, I will not have my staff waste time

> researching your complaints.  If the Executive Director ever removes
> your classification override we would be happy to research a
> challenge if you receive a reassessment you believe is in error.  I have
> instructed Ms. Brimhall to ignore any further challenges or
> correspondence from you regarding classification unless your
> Executive Director override is removed.  If you send anything, it will
> not be read or answered, it will simply be filed.

(Doc. No. 251, Ex. H p. 23.)

33.     Payne received subsequent Offender Reassessments on July 27, 2006, August 20,

2007, September 16, 2008, October 22, 2009 and October 7, 2010.  Although Payne's

classification code on each of these assessments qualified him for less restrictive housing, each of

the forms indicates that Payne was denied advancement based on continuance of the EDO.  None

of Payne's Offender Reassessments besides the July 8, 2005, form bear the signature or initials of

the Executive Director.  (Payne Offender Reassessment Forms (*Martinez* Report, Ex. B.)  Payne

has been housed in Uinta One continuously since his return from New Mexico in 2003.

(Offender Location (*Martinez* Report, Ex. B), at Misc. R. 000064-65.)  He is presently housed in

Uinta One, Section 3.  (Herman Declaration (Doc. No. 117-5).)

34.     On August 23, 2006, Deputy Director Christine Mitchell sent a letter to Plaintiff

regarding his continuing EDO.  Mitchell stated, "I received your leter dated August 2, 2006,

basically asking me to help you get moved, and revisiting the issue in your earlier appeal which I

responded to on June 23, 2006."  Mitchell went on to explain:

> Housing movements are handled by the proper officials who deal
> with the housing of inmates and I will not insert myself into that
> process.  What I will do, is have my staff members look in our files
> here to see if there is something in writing from the Executive
> Director regarding your Executive Director override, and I will send

16

a copy of that record to you.

(Doc. No. 251, Ex. H p. 19.)

### C. Current Executive Director Override Review Procedure

35.     On January 5, 2007, Thomas E. Patterson was appointed Executive Director of the Utah Department of Corrections.[4]  (Patterson Supp. Decl. (Doc. No. 269, Ex. 4) ¶ 2.)

36.     In February 2007 Robyn Williams was appointed Deputy Director of UDC.[5] Sometime that year Williams spoke with then-DIO Director Lowell Clark about regularizing the EDO review process by requiring that reviews be conducted each November.  (Hearing Transcript p. 20-21.)  Williams instructed Clark to ensure that prison officials review each EDO annually and make a formal recommendation to the Executive Director as to whether each EDO should be continued.  Although Williams did not issue formal written guidelines for conducting the EDO reviews, her understanding based on prior practice and her discussion with Clark was that the reviews would originate with the caseworker and proceed through the housing Lieutenant, Captain, Deputy Warden, Warden, DIO Director, Deputy Director and, finally, to the Executive Director.  (Hearing Transcript p. 21.)

37.     As performed under Deputy Director Williams, the formal EDO review process begins at the housing level with the Classification Review process, in which the caseworker performs the normal scoring and notes the EDO on the Offender Assessment Form.  The housing

---

[4]  Patterson stepped down as Executive Director on January 4, 2013.  Deputy Director Mike Haddon is currently serving as acting director.

[5]  Williams retired from UDC in January 2013.

Lieutenant and Captain each indicate their assent to continuing the EDO by reviewing and signing the form.  They may also request that the EDO be lifted by making a recommendation in the comments section of the form.

38.     Each year the Captain and Deputy Warden compile a packet of relevant information for each inmate with an EDO showing why the override was imposed and the inmate's current status.  The packet also includes an individual summary sheet highlighting important information about the inmate and making a recommendation regarding amendment, continuation, or termination of the particular EDO.  (Patterson Supp. Decl. ¶ 4.)

39.     These packets and individual summary sheets are then forwarded to the Warden for review.  The Warden then prepares a group summary sheet listing each EDO and recommendation for review by the DIO Director.  (Patterson Supp. Decl. ¶ 5.)  The Warden may recommend amendment, continuation, or termination of any EDO.  The Warden then forwards the individual packets, along with his group summary and recommendations to the DIO Director. (Patterson Supp. Decl. ¶ 6.)

40.     After review by the DIO Director, the group summary is forwarded, along with the individual packets and summaries, through the Deputy Director to the Executive Director of the Utah Department of Corrections.  (Patterson Supp. Decl. ¶ 7.)  The DIO Director may also prepare a separate memorandum offering his own assessment regarding any particular inmate. (Hearing Ex. G (Doc. No. 369).)

41.     After reviewing all the information the Deputy Director and Executive Director indicate their assent to the recommendations made below by signing or initialing the

18

memorandum from the DIO Director.  (Patterson Supp. Decl. ¶ 8.)   Based on the information

submitted the Executive Director ultimately decides whether to amend, terminate or continue

each EDO.  (Patterson Supp. Decl. ¶ 9.)  The memoranda are then sent to be scanned and entered

into the UDC document database (UDOCA).

### D.  Payne's Classification Challenges and EDO Reviews

42.     Patterson states that since being appointed Executive Director he has conducted

an annual review of every ongoing EDO.  (Patterson Supp. Decl. ¶ 3.)  Executive Director

Patterson has not reversed Payne's override and has indicated that he supports its continuation

given Payne's history and safety issues.  (Patterson Decl. (Doc. No. 199).)

43.     Payne has formally challenged his classification five times.  Payne's first

challenge was filed in 2004 and subsequent challenges were filed in 2005, 2008 and twice in

2011.  UDC has been unable to locate any documents from Payne's 2004 or 2005 challenges.

(Letter from Assistant Utah Attorney General Michelle M. Young dated January 13, 2012 (Doc.

No. 284).)

44.     Regarding his 2008 classification challenge, Payne received a letter from Margaret

Brimhall, Classification Review Officer, dated December 8, 2008, stating:

> Executive Director Scott V. Carver approved the initial use of the
> Executive Director Override on your July 8, 2005 Reassessment.  We
> did not go to a more formal written statement when initiating the
> Executive Director Override until Policy was revised in 2002.
> Director Patterson does not need to go back and approve the previous
> Director's decisions.  If the staff felt the use of the Override should
> be reviewed they could request it.  I do not think, however, that there
> can be a dissenting opinion regarding continuing the Executive
> Director Override to maintain you at Custody Level II.

19

(Brimhall Letter dated Dec. 8, 2008 (Doc. No. 285).)

45.     Payne's classification challenge form dated June 16, 2011, is not signed or completed by prison officials but bears the notation, "This question has been asked and answered," with the initials "MB."  (Classification Challenge Form dated June 8, 2008 (Doc. No. 285, at 3).)

46.     Defendants testified that in addition to the formal classification challenge process Payne can also contest his classification and housing assignment through the OMR process or through written correspondence with the Executive Director or other administrative officials. (UDC Policy No. FEr 06/02.04(D)(3) (*Martinez* Report, Ex. A) at UDC Policy 000263; Hearing Transcript p. 211.)  Staff members can also request to have an override amended or removed. (Nielsen Decl. (Doc. No. 117-4); UDC Policy No. FC 04/07.05 (*Martinez* Report, Ex. A), at UDC Policy 000064.)  To date, no staff member who has supervised Payne has made such a request.  (Nielsen Decl. (Doc. No. 117-4).)

47.     USP officials continued to hold OMRs concerning Payne approximately monthly until 2009, then semi-annually.  (C-Notes/OMRs; Benzon Decl. (Doc. No. 200).)  At each of these meetings, Payne and UDC staff, including Payne's caseworker, were present.  (C-Notes/OMRs; Benzon Decl..)  Payne's OMRs are now held annually, but Payne may request an OMR any time.  (*Id.*; Nielson Decl. (Doc. No. 117-4); Herman Decl. (Doc. No. 117-5); Benzon Decl. (Doc. No. 200).)   Payne has the opportunity to be heard with respect to his housing, classification, and day-to-day issues at each OMR.  (*Id.*)

48.     Despite the multi-tiered annual EDO review process described by Defendants,

only five documents have been found related to the administrative-level reviews of Payne's EDO since 2007.  The first document, chronologically, is an EDO-review summary memo dated May 28, 2009, from DIO Director Lowell Clark to Deputy Director Robyn Williams.  The memo identifies each inmate with an EDO and provides a brief paragraph regarding their status.  The paragraph about Payne states: "Override should remain.  Inmate Payne has been involved in several violent acts against other inmates.  He has been involved in the murders of two inmates while incarcerated, once in Utah and once in New Mexico."  The memo is initialed only by Lowel Clark.  (Hearing Ex. F (Doc. No. 369).)

49.    The second document is a one-page memo dated November 22, 2010, from DIO Director Steve Turley through Deputy Director Robyn Williams to Executive Director Tom Patterson.  This memo is devoted exclusively to Payne and provides only a brief overview of his status with a recommendation that his EDO remain in place.  It is initialed by Turley and Williams and is signed by Executive Director Patterson with the notation "approved."  (Hearing Ex. C (Doc. No. 369).)

50.    The third document is a two-page memo from Deputy Warden Jerry Pope to Warden Alfred Bigelow dated November 17, 2011, dealing exclusively with Payne's override. This document includes detailed information about Payne's history, housing assignment and conditions, sentence and a recommendation regarding his housing status.  It recommends that Payne remain in a "closed section" for security reasons.  It is not signed or initialed by anyone. (Hearing Ex. D (Doc. No. 369).)

51.    The fourth document is an EDO summary memo from Warden Alfred Bigelow to

21

DIO Director Steve Turley dated the November 22, 2011.  The memo references a "packet" with "information for the 14 inmates currently on Executive Director Override status" and includes a very brief summary paragraph for each of the EDO inmates.  The paragraph regarding Payne states: "Termination 08/04/2020, at which time he would be turned over to New Mexico state authorities on a detainer.  We recommend offender Payne remain on 'Executive Director Override' status to be reviewed in one year.  Payne is currently housed in Uinta I at the Draper site."  The memo is not signed or initialed by anyone.  (Hearing Ex. E (Doc. No. 369).)

52.     The last document is a two-page memo dated January 5, 2012, from DIO Director Steve Turley through Deputy Director Robyn Williams to Executive Director Tom Patterson.  This memo is devoted exclusively to Payne and provides a fairly detailed review of his disciplinary and institutional history, sentence and housing status.  It concludes with the recommendation:

> Since 2004 Payne has had 3 write-ups.  This is partially due to how we are managing him.  He is in a very controlled environment which limits his ability to act out.  Payne's history speaks for itself.  When he is not in a controlled environment, he has a greater propensity to act out and even take the life of other human beings.  We cannot take a risk and have that occur again.  Payne continues to ask to be moved or to have a roommate and we assess his situation on a regular basis.  With that being said, I recommend the Executive Director Override remain in place.

The document is initialed by Turley and Williams and signed by Executive Director Patterson.

53.     Defendants have not offered a definitive explanation for the dearth of documentation regarding Payne's administrative EDO reviews since 2007, but they speculate that some documents must have been lost during the transition to a new information management

system.  (Hearing Transcript p. 42-44; Michelle Young Letter (Doc. No. 184).)

## IV.  Legal Standard

The Fourteenth Amendment provides that no state shall "deprive any person of life,
liberty, or property, without due process of law."  U.S. Const. amend. XIV § 1.  "A liberty
interest may arise from the Constitution itself, by reason of guarantees implicit in the word
'liberty,' or it may arise from an expectation or interest created by state laws or policies."
*Wilkinson v. Austin*, 545 U.S. 209, 221, 125 S. Ct. 2384, 2393 (2005) (citations omitted).  While
it is well-settled that due-process protections extend to prisoners, the extent of that protection is
significantly less than that guaranteed to free persons.  *See*, e.g., *Wolff v. McDonnell*, 418 U.S.
539, 555-57, 94 S. Ct. 2963, 2974-78 (1974).  In fact, lawfully incarcerated persons retain only a
narrow range of protected liberty interests, *Abbott v. McCotter*, 13 F.3d 1439, 1442 (10th Cir.
1994), and "[t]he Due Process Clause standing alone confers no liberty interest in freedom from
state action taken within the sentence imposed."  *Sandin*, 515 U.S. at 480 (quotation marks and
citation omitted).

In the prison context, state regulations can create protected liberty interests, but such
interests are "generally limited to freedom from restraint which, while not exceeding the sentence
in such an unexpected manner as to give rise to protection by the Due Process Clause of its own
force, nonetheless imposes atypical and significant hardship on the inmate in relation to the
ordinary incidents of prison life."  *Sandin*, 515 U.S. at 484 (citations omitted).  The Tenth Circuit
has identified certain relevant, albeit non-dispositive, factors for determining whether segregated
confinement gives rise to a protected liberty interest, including: "whether (1) the segregation

23

relates to and furthers a legitimate penological interest, such as safety or rehabilitation; (2) the conditions of placement are extreme; (3) the placement increases the duration of confinement . . . ; and (4) the placement is indeterminate." *Estate of DiMarco v. Wyoming Dep't of Corr.*, 473 F.3d 1334, 1342 (10th Cir. 2007). The Tenth Circuit has counseled, however, that "any assessment must be mindful of the primary management role of prison officials who should be free from second-guessing or micro-management from the federal courts." *Id.*

In *Hewitt v. Helms*, 459 U.S. 460, 103 S. Ct. 864 (1983), the Supreme Court examined whether Pennsylvania regulations which created a careful procedural structure for limiting the use of administrative segregation gave rise to a protected liberty interest. After concluding that the regulations did create such a protected liberty interest, the Court went on to examine whether the process afforded to the inmate satisfied the minimum requirements of the Due Process Clause.[6] *Hewitt*, 459 U.S. at 472, 103 S. Ct. at 872. The Court noted that "[i]n determining what is 'due process' in the prison context . . . 'one cannot automatically apply procedural rules designed for free citizens in an open society . . . to the very different situation presented by a disciplinary proceeding in a state prison.'" *Id.* (quoting *Wolff,* 418 U.S. at 560, 94 S. Ct. at 2976). And, that "'[p]rison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.'" *Id.* (quoting *Bell v. Wolfish,*

---

[6] Although in *Sandin* the Supreme Court abandoned the methodology used in *Hewitt* for determining whether a liberty interest was created, its due-process analysis remains good law. *See Sandin v. Conner*, 515 U.S. 472, 484 n. 5, 115 S. Ct. 2293 (1995); *Wilkinson v. Austin,* 545 U.S. 209, 229, 125 S. Ct. 2384 (2005).

441 U.S. 520, 547, 99 S. Ct. 1861, 1877 (1979)).  With these considerations in mind the Court

found that due process required only "an informal, nonadversary review of the information

supporting [the inmate's] administrative confinement, including whatever statement [he] wished

to submit, within a reasonable time after confining him to administrative segregation."  *Id*.

Although *Hewitt* required only minimal procedures for initiating ad-seg placements, it

also noted that "administrative segregation may not be used as a pretext for indefinite

confinement of an inmate.  [And] [p]rison officials must engage in some sort of periodic review

of the confinement of such inmates."  *Id.* at 477 n. 9.  Regarding the scope of such reviews, the

Court explained:

> This review will not necessarily require that prison officials permit
> the submission of any additional evidence or statements.   The
> decision whether a prisoner remains a security risk will be based on
> facts relating to a particular prisoner – which will have been
> ascertained when determining to confine the inmate to administrative
> segregation – and on the officials' general knowledge of prison
> conditions and tensions, which are singularly unsuited for "proof" in
> any highly structured manner.

*Id.*  Although the review need not be extensive, it is well recognized that the review must be

meaningful; it cannot be merely a sham or pretext.  *See Kelly v. Brewer*, 525 F.2d 394, 400 (8th

Cir. 1975); *Sourbeer v. Robinson*, 791 F.2d 1094, 1101 (3d Cir. 1986); *McClary v. Coughlin*, 87

F. Supp. 2d 205, 214 (W.D.N.Y. 2000).

In *Wilkinson v. Austin,* 545 U.S. 209, 125 S. Ct. 2384 (2005), the Supreme Court

addressed the question of "what process is due" to inmates housed in long-term administrative

segregation for security reasons.  545 U.S. at 224, 125 S. Ct. at 2394.  Noting that "the

25

requirements of due process are flexible and call for such procedural protections as the particular

situation demands," *id*., the Court declined "to establish rigid rules," *id*., and, instead, followed

its traditional framework governing procedural due process found in *Mathews v. Eldridge*, 424

U.S. 319, 96 S. Ct. 893 (1976).   That framework requires consideration of three distinct factors:

> First, the private interest that will be affected by the official action;
> second, the risk of an erroneous deprivation of such interest through
> the procedures used, and the probable value, if any, of additional or
> substitute procedural safeguards; and finally, the Government's
> interest, including the function involved and the fiscal and
> administrative burdens that the additional or substitute procedural
> requirement would entail.

*Id.* at 335, 96 S. Ct. at 903.

In *Estate of DiMarco v. Wyoming Dep't of Corr.*, 473 F.3d 1334 (10th Cir. 2007), the

Tenth Circuit summarized the Supreme Court's analysis in *Wilkinson* to conclude that "due

process was satisfied as long as a state allowed (1) a sufficient initial level of process, i.e., a

reasoned examination of the assignment;  (2) the opportunity for the inmate to receive notice and

respond to the decision;  and (3) safety and security concerns to be weighed as part of the

placement decision."[7]  *Id*. at 1344 (citing *Wilkinson,* 545 U.S. at 224-25, 125 S. Ct. at 2395).  The

---

[7]  In *Toevs v. Reid*, No. 10–1535, 2012 WL 1085802 (10th Cir. Apr. 2, 2012), the Tenth
Circuit adopted a more stringent review for inmates placed in ad-seg under a "stratified incentive
program" intended "solely and exclusively" for the purpose of modifying behavior.  The Court
held that under those very narrow circumstances a "meaningful review" was one "that evaluates
the prisoner's current circumstances and future prospects, and, considering the reason(s) for his
confinement to the program, determines whether that placement remains warranted."  *Id.* at *6.
Because Plaintiff is not in any type of behavior-modification program, but is being kept in ad-seg
exclusively for security reasons, the *Toevs* standard is not applicable here.  Moreover, the Tenth
Circuit has not adopted the more stringent standards for meaningful review applied in some other
circuits, including the Eighth Circuit under *Kelly v. Brewer*, 525 F.2d 394 (8th Cir. 1975), and its

Tenth Circuit also highlighted the Supreme Court's guidance that "where a decision 'draws more

on the experience of prison administrators, and where the State's interest implicates the safety of

other inmates and prison personnel, [ ] informal, nonadversary procedures' that allow notice and

the opportunity to be heard are sufficient."  *Id.* (quoting *Wilkinson*, 545 U.S. at 228-29, 125 S. Ct.

at 2397).

### V.  Sufficiency of Process Afforded Plaintiff

### A.  Initial Placement

Upon his return to USP from New Mexico Plaintiff underwent a routine intake evaluation

and was initially placed in ad-seg under the most restrictive security available for non-death row

inmates.  Days later, on December 23, 2003, Plaintiff underwent his first OMR hearing before his

caseworker, housing Lieutenant (Unit Manager) and Captain (Correctional Administrator), where

it was decided that Plaintiff should remain in his existing housing assignment for thirty days

pending further observation and review.  That same day, officials initiated Plaintiff's first

Offender Assessment under the Inmate Classification system.  Plaintiff's score on this

assessment did not qualify him for less restrictive housing.  On January 21, 2004, Plaintiff

attended another OMR where he was assigned to the lowest privilege level under the Privilege

Behavior Reward System and allowed to begin receiving privilege advancements for good

behavior.

Plaintiff raises two primary arguments challenging the sufficiency of his initial

---

progeny.

placement.  First, Plaintiff asserts that prison officials incorrectly placed him in ad-seg for his

own safety based on the false assumption that he had a "snitch label" stemming from the Lonnie

Blackmon murder.  As support for this contention Plaintiff cites the first Declaration of Retired

Deputy Warden Blake Nielson (Doc. No. 117-4) which stated that Plaintiff testified against

others involved in the Blackmon murder in return for a lighter sentence, thereby garnering a

"snitch label" which placed him in extreme danger from other inmates.  (*Id.* ¶ 13.)  Nielsen later

filed a supplemental declaration clarifying that he had no direct knowledge of any such testimony

or plea deal; however, he reiterated his concern that Plaintiff *might* have a "snitch label" as one

of the grounds justifying Plaintiff's initial placement in segregated confinement.  (Doc. No. 124.)

Plaintiff categorically denies Nielsen's assumption and argues that it shows Plaintiff's initial

placement in ad-seg was seriously flawed.  However, even accepting Plaintiff's assertion that

Nielsen's concerns about a "snitch label" were unfounded, there is no doubt that other concerns

provided ample justification for the placement.  Specifically, Plaintiff's institutional history, of

which prison officials were well aware, and the need to further evaluate Plaintiff before moving

him to less-restrictive housing.  Thus, any dispute regarding whether Plaintiff garnered a "snitch

label" is largely immaterial to determining whether his initial placement was justified.

Second, Plaintiff argues that USP officials had no reason to place him in ad-seg because

well before his return from New Mexico he was released from segregated confinement there and

was being housed with other inmates without incident.  Plaintiff essentially argues that New

Mexico's decision to return Plaintiff to general population following the murder there, and the

lack of any further serious incidents, effectively precluded Utah prison officials from concluding

that segregated confinement was necessary upon his return to USP.  This argument is wholly without merit.  While the fact that Plaintiff was able to work his way out of segregation in New Mexico might have some bearing on his prospects of eventually doing so here, it has little relevance to the initial decision to place Plaintiff in ad-seg upon his return to Utah.  Not only did USP officials need time to observe and evaluate Plaintiff under their own criteria, they also undoubtedly realized that every correctional institution presents its own safety and security concerns given its unique inmate population, facilities and staff.  Moreover, due process does not require that USP officials defer or give any particular weight to the judgment of officials in another jurisdiction; instead, it requires only that prison officials exercise their own judgment based on relevant facts.

The record does not support the conclusion that Plaintiff was denied due process regarding his initial placement in ad-seg.  Instead, it shows that Plaintiff was promptly evaluated by proper officials and was assigned to ad-seg based on legitimate safety and security concerns. Given the reason for Plaintiff's return from New Mexico--specifically, the termination of his Interstate Compact Placement following his conviction for murdering another inmate while in ad-seg there--there can be little doubt that USP officials were justified in initially placing Plaintiff in the most secure housing available pending further review.  Moreover, the record clearly shows that Plaintiff promptly received thorough evaluation under the prison's standard review procedures which included a reasoned examination of his assignment.  Plaintiff has not shown that he was denied notice of these procedures or an opportunity to be heard.  In addition, Plaintiff was notified in writing through the Offender Assessment Form of the reasons for his

29

Classification Code and initial placement.  Plaintiff filed a formal Classification Challenge

regarding this assessment and received a prompt response from Captain Shelby Herbert,

Classification Review Officer, on March 15, 2004, acknowledging a minor scoring error but

finding that the error did not affect Plaintiff's security score or qualify him for different housing.

(Doc. No. 251, Ex. H p. 7.)   Thus, Plaintiff cannot show that he was denied due process with

regard to this initial placement in ad-seg.

### B.  Implementation of EDO

Plaintiff raises several challenges to the initial implementation of the EDO in 2005.  First,

Plaintiff asserts that prison officials did not follow formal procedures and that the EDO request

was merely an ad-hoc attempt to keep him in ad-seg indefinitely without justification.  Second,

Plaintiff asserts that he was not given adequate notice of the decision, including a detailed

explanation of why the EDO was being invoked, and that there was inadequate documentation at

the prison level.  Third, Plaintiff asserts that he was denied meaningful participation or the

opportunity to be heard regarding implementation of the EDO, and that there was no viable

avenue to appeal the decision.  Finally, Plaintiff challenges the apparent lack of formal review or

documentation procedures at the administrative level.

Plaintiff's assertion that he was entitled to a formal hearing regarding implementation of

the EDO is unfounded.  Although the EDO significantly altered the nature of Plaintiff's ad-seg

confinement (Plaintiff asserts it effectively made it indefinite), that did not entitle Plaintiff to

heightened procedural protections.  As noted in *Hewitt*, all that was required was "an informal,

nonadversary review of the information supporting [Plaintiff's] administrative confinement,

including whatever statement [he] wished to submit, within a reasonable time after confining him

to administrative segregation." *Hewitt*, 459 U.S. at 472.  This requirement was satisfied here.

The caseworker's comments on the Offender Reassessment Form clearly indicate continued

concern about Plaintiff's participation in the murders of two other inmates while incarcerated.

Lieutenant Cawley also cited the murders and further noted, "Serious consideration should

always be used when determining all classification and housing issues concerning this offender."

(Reassessment Form dated July 8, 2005 (*Martinez* Report, Ex. B), at Misc. R. 000048-49.)  This

notation shows that, before approving the EDO request, Lt. Cawley seriously considered

Plaintiff's history of institutional violence and the potential risks associated with placing him in

less restrictive housing.  Because the record shows that prison officials made a reasoned

examination of Plaintiff's housing assignment before requesting the EDO, Plaintiff cannot show

that he was denied the informal, non-adversarial review to which he was entitled.

Plaintiff's assertion that he was denied adequate notice regarding the EDO also lacks

merit.  Although Plaintiff admits receiving a copy of the top page of the Offender Reassessment

Form showing the EDO, he argues that he had no way of knowing the basis for the EDO because

he was not provided a copy of the comments section of the form.  There is ample evidence in the

record that inmates are not permitted to see the comments section of the reassessment forms, but

are only given a copy of the top page.  Although this is disconcerting, it does not show that

Plaintiff was denied notice of the reasons for the EDO or a reasonable opportunity to respond to

the decision.  In fact, Plaintiff repeatedly mentions in his grievances that he was purportedly

being kept in ad-seg based on safety and security concerns stemming from his past history.

Morever, in his letter to Executive Director Carver, Plaintiff clearly stated his understanding that prison officials were citing ongoing safety and security concerns as the basis for requesting the EDO. (Doc. No. 251, Ex. H p. 51.) While Plaintiff may not have agreed with their assessment, he obviously understood the rationale for the EDO request and was able to present arguments against it. Thus, Plaintiff was not denied adequate notice regarding implementation of the EDO.

The record also shows that Plaintiff was allowed meaningful participation in the reassessment process, and that he had ample opportunity to challenge the implementation of the EDO. Plaintiff was allowed to discuss the override with his caseworker and housing supervisors during his numerous OMR hearings. Plaintiff's grievances show that during his OMR on June 23, 2005, he discussed the subject of his housing assignment and the possibility of moving out of intensive management. (Doc. No. 251, Ex. H p. 47.) Records also show that following the reassessment on July 8, 2005, in which the EDO was invoked, Plaintiff continued to receive OMR hearings monthly. Plaintiff was also allowed to file a formal Classification Challenge regarding the EDO. Although classification decisions are not ordinarily reviewed through the grievance process, Plaintiff was also allowed to file several grievances regarding his EDO, to which he received numerous written responses. Finally, as previously mentioned, Plaintiff wrote a letter directly to Executive Director Carver discussing in detail his concerns about the EDO. (Doc. No. 251, Ex. H p. 51.) Thus, there is no basis for Plaintiff's assertion that he was denied a meaningful opportunity to offer input regarding implementation of the EDO.

Perhaps Plaintiff's strongest argument regarding deficiencies in the EDO implementation process stems from the lack of formal procedures or documentation at the administrative level.

Plaintiff asserts that the ad-hoc manner in which Executive Director Carver approved the override, by simply initialing the reassessment form without comment, shows that there was no reasoned examination at the highest level and that the override was merely rubber-stamped. There is some merit to this argument.  Indeed, given the fact that the Executive Director bears ultimate responsibility for the override, and that only he can remove it, the lack of any documentation showing the administrative-level review process raises some concern.  Despite this deficiency, however, Plaintiff has not presented any evidence refuting Deputy Warden Nielsen's declaration that he personally petitioned Executive Director Carver for the override and that Carver approved it by initialing the reassessment form.  Thus, the lack of defined procedures was ameliorated by the actual process afforded Plaintiff.  Given the numerous layers of prison-level review, and Carver's obvious reliance upon the recommendations of those at lower levels, the court cannot say that the administrative review of the initial override amounted to a denial of due process.

### C.  2006 EDO Review

Plaintiff asserts that he was not afforded meaningful review of his EDO from the time it was initially approved by Executive Director Carver in mid-2005 until after Carver departed in early 2007.  Plaintiff points to several documents generated by the inmate grievance and classification review systems as evidence that prison officials saw no need to formally review Plaintiff's EDO status during this time, but treated the EDO as essentially a *fait accompli*. Plaintiff asserts that these documents show a denial of due process.

Plaintiff correctly points out that the record is devoid of any documentary evidence

33

showing that Executive Director Carver personally reviewed Plaintiff's EDO between the time it was approved until Carver departed from UDC nearly eighteen months later.  Defendants do not dispute this point, essentially conceding that the administrative-level EDO review procedure during this period left much to be desired.  Robyn Williams testified that following her appointment as Deputy Director under Patterson, she promptly spoke to her subordinates about regularizing the EDO review process.  Although Williams downplayed any shortcomings in the review process under Carver, she freely admitted that she was not comfortable with how the reviews were being handled and she directed that they be improved.

As mentioned previously, immediately after implementation of the EDO Plaintiff began what can only be described as a multi-pronged campaign to have the override lifted.  This effort included filing numerous inmate grievances, filing a formal Classification Challenge, and launching a letter-writing campaign to various UDC administrators and other Utah state officials, including the Governor.  While these efforts were met with varying degrees of success, they did attract considerable attention to Plaintiff's circumstances which prompted action at both the prison and administrative level.

In response to his prison grievances Plaintiff received numerous written responses from prison officials at all levels, including the Warden.  Although Plaintiff's grievances were uniformly denied on the grounds that classification and housing decisions cannot be grieved, several of the grievance responses directly addressed Plaintiff's due-process concerns, repeating the reasons for Plaintiff's override and reaffirming that Plaintiff was being afforded due process. While Plaintiff was understandably dissatisfied with these responses, they do show that

34

Plaintiff's concerns were being heard and addressed at the prison level.

Plaintiff also received due process through his formal 2005 Classification Challenge and appeals.  The record shows that Plaintiff received several detailed responses from Tom Anderson, the Management Services Administrator, regarding this challenge.  Anderson repeatedly explained that, regardless of any alleged scoring mistakes, Plaintiff's placement was correct given the ongoing EDO.  These responses show that the EDO was not kept in place due to mere a oversight or failure to heed Plaintiff's complaints, but, rather, based on the continuing recommendations of prison officials who repeatedly reexamined Plaintiff's situation in response to his complaints.  Although Anderson also made other exaggerated comments which were not necessarily pertinent to Plaintiff's challenge, there is no indication that those statements seriously prejudiced Plaintiff.

In a letter dated October 3, 2005, in response to redundant appeals by Plaintiff, Anderson stated that until Plaintiff's EDO was removed, "any further challenges or correspondence from [Plaintiff] regarding classification" would be ignored.  (Doc. No. 251, Ex. H p. 23.)  Anderson further told Plaintiff, "If you send anything, it will not be read or answered, it will simply be filed."  (*Id*.)  It is doubtful whether Anderson had authority to indefinitely suspend Plaintiff from the Classification Challenge System in this manner.  And, Plaintiff is probably correct that such a suspension, if enforced, would amount to a denial of due process under the ad-seg review scheme then in place at the prison.  But, Anderson's purported suspension of Plaintiff from the Classification Challenge System did not deny Plaintiff due process, because the undisputed evidence shows that Plaintiff managed to have his EDO reviewed through other channels.  The

record also shows that despite Anderson's statements no such suspension was actually enforced. In fact, Margaret Brimhall testified that she did not believe Anderson really intended to suspend Plaintiff from the Classification Challenge System indefinitely, but merely wanted to dissuade Plaintiff from continuing to file redundant grievances about his 2005 reassessment.  Brimhall testified that because the Classification Challenge policy did not include any provision for suspending inmates from the system, she believed that Anderson must have been referring to the grievance system.  (Hearing Transcript p. 212-13.)  Based on this understanding, Brimhall stated that she did not actually ignore further correspondence from Plaintiff, instead, she responded to redundant inquiries by simply stating that they "had previously been asked and answered."  (*Id.*) Moreover, there is no evidence that Plaintiff actually filed a formal Classification Challenge that was ignored based on his purported suspension.  Thus, Plaintiff cannot show that Anderson's actions denied Plaintiff due process.

Despite his purported suspension from the Classification Challenge System, Plaintiff was able to present his concerns about the continuing EDO directly to corrections administrators through his ongoing letter-writing campaign.  Although Plaintiff never received a direct response from Executive Director Carver, Plaintiff did receive a letter from then-Deputy Director Christine Mitchell, dated August 23, 2006.  (Doc. No. 251, Ex. H p. 19.)  Mitchell confirmed that the EDO was invoked by Carver, as required by policy, and promised to have her staff look for any official documents showing Carver's approval.  While it appears no such documents were ever turned over to Plaintiff, and that the only documentation from Carver was his initials on the 2005 reassessment form, it is clear from Mitchell's letter that she was fully aware of Plaintiff's

36

placement, that she believed Carver was also aware and approved continuation of the EDO, and

that she saw no valid reason to have it lifted. This correspondence shows that Plaintiff's EDO

was reviewed at the highest levels of UDC within about one year from the time it was

implemented.

Despite the lax EDO review process under Executive Director Carver, given the other

layers of review and the informal avenues of redress available to Plaintiff, it does not appear that

Plaintiff suffered a cognizable denial of due process during Carver's tenure. Although, ideally,

the Executive Director should personally approve continuation of each EDO on a periodic basis,

as he alone has authority under the policy to rescind it, nothing prohibits this responsibility from

being delegated to the Deputy Director, as it effectively was in this case. Thus, even assuming

that Carver did not personally review Plaintiff's EDO during this time, Plaintiff cannot show a

denial of due process.

### D.  Process Afforded Since 2007

Throughout Executive Director Patterson's tenure Plaintiff continued to receive regular

classification reassessments. Records show that on each of these reassessments the caseworker

noted the continuing EDO and the reasons for it. Although copies of the caseworker's and

correctional officers' notes were not given to Plaintiff, there is ample evidence that the reasons

for continuing the EDO were explained to Plaintiff in his OMRs and other visits with prison

officers. This was enough to allow Plaintiff to file formal Classification Challenges and to

appeal informally to prison staff and corrections administrators. While Plaintiff continuously

argued that the EDO was unnecessary, there is no evidence that any prison official or corrections

administrator ever agreed or recommended that Plaintiff's EDO should be lifted.  Thus, procedural deficiencies are not the reason Plaintiff remains in ad-seg.

Plaintiff asserts he continued to be denied due process under Patterson's tenure due to his ongoing suspension from the Classification Challenge System.  As previously noted, despite the purported suspension Plaintiff was able to file a formal Classification Challenge in 2008.  He also filed two formal challenges in 2011.  Margaret Brimhall's written response to Plaintiff's 2008 challenge shows that it was reviewed and processed normally.  Plaintiff argues Brimhall's statement, "Director Patterson does not need to go back and approve the previous Director's decisions," shows she saw no need for officials to regularly reconsider whether the EDO should be continued.  (Doc. No. 251, Ex. H p. 18.)  But, based on her testimony it is apparent that Brimhall was referring only to Carver's initial determination that the EDO was warranted, she was not saying there was no need to periodically review Plaintiff's status.  (Hearing Transcript p. 204-05.)  Moreover, Brimhall's statement, "We did not go to a more formal written statement when initiating the Executive Director Override until Policy was revised in 2002," appears to be simply a typographical error.  Brimhall apparently meant to say "2007," as that was when the changes were implemented by Deputy Director Williams.  (Hearing Transcript p. 205.)  More importantly, in her letter Brimhall explained that, "If the staff felt the use of the Override should be reviewed they could request it."  This clearly shows that Brimhall believed prison staff could request that the EDO be lifted at any time and the request would be passed through appropriate channels to the Executive Director.  Finally, although Brimhall also expressed her own opinion regarding the EDO, there is no evidence that it had any influence on other decision-makers.

38

Plaintiff has not offered any evidence to support his argument that other officials, particularly prison housing officers, declined to recommend lifting the EDO based on the opinions of Brimhall or Anderson.

Plaintiff also cites the dearth of documentation regarding the administrative level reviews during Patterson's tenure as evidence of insufficient process.  It is true that many of the documents purportedly generated over the years in relation to Plaintiff's EDO reviews have not been produced in this litigation.  Indeed, that is the reason the court found it necessary to conduct a discovery hearing and create a record on the issue with testimony from each of the corrections administrators involved.  That testimony shows appropriate reviews were conducted at each level, as described in Patterson's Supplemental Declaration.  (Doc. No. 269, Ex. 4.)  The absence of documentation does not constitute a due-process violation, especially given the plausible explanation for why the documents are missing--that they were lost in the transition between record management systems.

In sum, the record supports Defendants' contention that the administrative EDO review process was substantially improved under Executive Director Patterson and that Plaintiff received due process under Patterson's tenure.  Although it appears the improvements resulted primarily from greater attentiveness and supervision, rather than significant policy changes, the record shows that administrative officials regularly reviewed Plaintiff's circumstances throughout Patterson's tenure and ensured that procedures were in place to allow the EDO to be lifted upon the recommendation of prison staff.  This was sufficient to satisfy the minimal requirements of due process.

### E.  Ongoing Review Process

The current EDO review process starts at the housing level with the annual Offender Reassessment/Classification Review.  Inmates are given advance notice of these reviews and are allowed to submit written materials and make verbal statements as part of the process; however, they are not allowed to call witnesses.  Although inmates are given a copy of the completed Reassessment form, they are not provided a copy of the caseworker's and housing officers' notes regarding the classification decision.  The initial Reassessment/Classification can be appealed through the Classification Challenge System, although there is no formal appeal from the Classification Review Officer's decision.  The administrative EDO review process, as implemented by Deputy Director Williams, begins with the Captain and Deputy Warden annually preparing individual packets regarding each inmate under an EDO with recommendations for the Warden.  These materials are then passed through the DIO Director and Deputy Director before ultimately being approved by the Executive Director.  Inmates can also make informal written appeals directly to administrative officers, or anyone else they want, although there is no formal process for handling such appeals.

While the court is satisfied that this process has proven sufficient to afford Plaintiff adequate process up to this point, it is true that additional procedural safeguards might be advisable under present caselaw, based on the factors laid out by the Supreme Court in *Mathews v. Eldridge,* 424 U.S. 319, 96 S. Ct. 893 (1976).  These include: (1) the interest that will be affected by the official action; (2) the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural

40

safeguards; and (3) the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.  *Id.* at 335, 96 S. Ct. at 903.  The court will briefly consider how each of these factors relate to the ongoing reviews of Plaintiff's EDO, while bearing in mind the "wide-ranging deference" to be accorded prison administrators as to such decisions.  *See Hewitt*, 459 U.S. at 472, 103 S. Ct. at 872.

Addressing the first factor, assuming Plaintiff's housing conditions are atypical, Plaintiff clearly has a significant interest in avoiding continued confinement in ad-seg, if possible without undermining the state's legitimate penological interests in safety and security.  While it may be debatable (and is not yet determined) whether Plaintiff's conditions are "atypical" as defined under relevant caselaw, there is no denying that Plaintiff's housing conditions are substantially more restrictive than those endured by the vast majority of inmates in UDC custody.  This fact, combined with the remarkable length of Plaintiff's segregated confinement, strongly supports the need for adequate procedural safeguards to ensure that Plaintiff's status is regularly and fairly reviewed.

That being said, the second *Mathews* factor is particularly relevant here.  The lack of a written EDO review policy creates considerable risk that an erroneous deprivation might occur under the existing procedures.  This is especially true given the apparent disconnect between the Classification Challenge System and the administrative review process.  In her testimony, Margaret Brimhall conceded that according to policy the Classification Challenge System is the only avenue for formally challenging an override, but that the policy does not provide for any

41

appeal from her decisions as Classification Review Officer.  Although Brimhall stated that

inmates are theoretically free to appeal her decisions "to anyone they want," she admitted that the

only way an inmate would know this is to infer it from the fact that "everyone has a supervisor."

(Hearing Transcript p. 212-13.)  While that may be true, an inmate could just as easily conclude

from the policy that Brimhall's word is final and that any attempt to appeal her decision outside

the defined process might have negative repercussions.[8]  The lack of a formal process for

appealing the Classification Review Officer's decisions regarding EDOs to administrative

officials is troubling.

Additional procedural safeguards would improve the process.  The most useful safeguard

would be a written policy outlining the procedure for appealing an override to the level where it

can actually be lifted.  For an Executive Director Override, the appeal would need to reach the

Executive Director himself, or someone to whom he has conferred authority to lift the override.

The policy could clearly state how regularly scheduled reviews are to be initiated and conducted,

and describe the role of each person involved in the review process.  Guidelines for completing

and preserving documentation associated with these reviews, and for providing copies to

inmates, would also be highly beneficial.  Finally, instructions for inmates explaining the notice

they will receive and their opportunities to be heard at various levels would reduce confusion.

Turning to the third *Mathews* factor, it does not appear that such additional procedural

---

[8]  Plaintiff's willingness to take this risk may well have been the only reason his status
was reviewed by administrative officials in 2006, given his suspension from the challenge system
and the apparent failure to initiate a routine administrative review that year.

safeguards would entail major fiscal and administrative burdens.  Instead, based on the present

record it appears the majority of these functions are already being routinely carried out but could

simply be streamlined and codified into policy to ensure consistency.  While doing so might

require some additional time and expense, resources would be conserved by defining the review

process to avoiding confusion and redundancy.[9]  Moreover, even assuming that these additional

safeguards will entail some burden and expense, those concerns are outweighed by the significant

risk that an inmate could be deprived of due process under current procedures.

    In sum, while it appears that significant improvements could be made to the existing

EDO review process without undermining penological objectives or imposing major fiscal or

administrative burdens, the court cannot say that the procedures currently in place afford

inadequate process under controlling law.  Under current Tenth Circuit precedent due process is

satisfied as long as the state allows "(1) a sufficient initial level of process, i.e., a reasoned

examination of the assignment; (2) the opportunity for the inmate to receive notice and respond

to the decision; and (3) safety and security concerns to be weighed as part of the placement

decision."  *Estate of DiMarco v. Wyoming Dep't of Corr.*, 473 F.3d 1334, 1344 (10th Cir. 2007).

The record shows that if exercised properly, as they have been up to this point, the current EDO

---

[9]  The process could also be streamlined by reducing the number of administrative levels
the reviews pass through before reaching the Executive Director.  The record does not show why
the DIO Director, Deputy Director and Executive Director each need to be included in the review
chain if the Executive Director is the only person with authority to lift the EDO.  Unless these
officials have personal experience with the inmates under review, or have authority to lift the
override without further approval from a superior, it is not clear how they can meaningfully
contribute to the review process.

review practices and the EDO review process afforded Plaintiff satisfy each of these requirements.

## VI.  Conclusion

On the extensive record developed on this motion, Plaintiff has not met his burden on summary judgment of presenting admissible evidence showing a genuine issue of material fact as to whether he was denied due process regarding his confinement in administrative segregation. Instead, the record shows that Plaintiff was afforded due process with regard to his initial placement in 2003; that Plaintiff has received meaningful periodic reviews of his placement since that time; and that the current review procedures are sufficient to ensure Plaintiff adequate process going forward.  While improvements could be made to the EDO review process to further reduce the risk of an erroneous deprivation, the court will not insert itself into the realm of prison administration or policy making.

**ORDER**

Accordingly, **IT IS HEREBY ORDERED** that Defendants' Motion for Summary

Judgment (Doc. No. 197) is **GRANTED**.  The Clerk is directed to close the case.

DATED this 25th day of January, 2013.

BY THE COURT:

DAVID NUFFER
United States District Judge